557 F.2d 24
 1977-1 Trade Cases 61,446
 BOC INTERNATIONAL LTD., f/k/a the British Oxygen Co. Ltd.,
BOC Financial Corp., BOC Holdings, Ltd., and
British Oxygen Investments, Ltd., Petitioners,
v.
FEDERAL TRADE COMMISSION, Respondent.
AIRCO, INC., Petitioner,
v.
FEDERAL TRADE COMMISSION, Respondent.
 Nos. 173, 175, Dockets 76-4044, 76-4045.
 United States Court of Appeals,
Second Circuit.
 Argued March 3, 1977.
Decided May 19, 1977.
 
 Jay Topkis, New York City (Lewis A. Kaplan, Moses Silverman, Bruce L. Owens, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, of counsel), for petitioner BOC.
 W. Foster Wollen, New York City (R. Bruce MacWhorter, Danforth Newcomb, Gabrielle R. Campbell, Shearman & Sterling, New York City, of counsel), for petitioner Airco.
 Jerold D. Cummins, Acting Asst. Gen. Counsel, F. T. C., Washington, D. C. (Robert J. Lewis, Gen. Counsel, Gerald P. Norton, Deputy Gen. Counsel, F. T. C., Washington, D. C., of counsel), for respondent.
 Earl W. Kintner, Mark R. Joelson, Joseph P. Griffin, Arent, Fox, Kintner, Plotkin & Kahn, Washington, D. C., filed brief of the Government of the United Kingdom of Great Britain and Northern Ireland as amicus curiae, urging that order be set aside.
 Before LUMBARD and OAKES, Circuit Judges, and BRYAN, District Judge.*
 OAKES, Circuit Judge:
 
 
 1
 The legal theory involved in this petition to review lies on the frontiers of antitrust law. See FTC v. Atlantic Richfield Co., No. 76-2250, 549 F.2d 289 at 293 (4th Cir. 1977). The Supreme Court has twice declined, United States v. Marine Bancorporation, Inc., 418 U.S. 602, 639, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974) (hereinafter Marine Bancorp.); United States v. Falstaff Brewing Corp., 410 U.S. 526, 537, 93 S.Ct. 1096, 35 L.Ed.2d 475 (1973) (hereinafter Falstaff ), to pass on the validity of the theory that has come to be known as the "actual potential entrant" doctrine, Falstaff, supra, 410 U.S. at 560, 93 S.Ct. 1096 (Marshall, J., concurring). This doctrine would proscribe as violative of Section 7 of the Clayton Act, 15 U.S.C. § 18, a company's acquisition of a large firm in an oligopolistic market if the acquiring company at some future date is expected to enter the market de novo or through a "toehold" acquisition of a firm lacking a significant share of the market. See Falstaff, supra, 410 U.S. at 537, 93 S.Ct. 1096. According to the theory, the effect of such an acquisition "may be substantially to lessen competition." Clayton Act § 7, 15 U.S.C. § 18.
 
 
 2
 The validity of this type of acquisition is a question squarely presented by the order of the Federal Trade Commission (FTC) under review here. Like the Supreme Court in Marine Bancorp., 418 U.S. at 639, 94 S.Ct. 2856, however, we have concluded that a fundamental "precondition" to application of the doctrine has not been established on the record before us. We accordingly set aside the Commission's order and "leave for another day," Falstaff, 410 U.S. at 537, 93 S.Ct. 1096, the issue of the doctrine's basic validity.
 
 I.
 
 3
 BOC International Limited (BOC), formerly known as the British Oxygen Company, has petitioned this court, pursuant to 15 U.S.C. § 21(c), to set aside an FTC order directing BOC, inter alia, to divest itself of its controlling stock interest in Airco, Inc.[1] As found by the Commission, BOC is a multinational corporation and the world's second largest producer of industrial gases, such as acetylene, carbon dioxide, argon, helium, hydrogen, nitrogen, oxygen, and nitrous oxide, which are used by the medical profession, steel companies, manufacturers, welders, contractors, and others. In re British Oxygen Co. ("Opinion of the Commission"), No. 8955, slip op. at 3, 6 (FTC Dec. 8, 1975) (hereinafter FTC Op.). BOC has never produced or sold industrial gases in the United States. Airco, according to the Commission, is the third largest industrial gases producer in the United States, with an approximate 16% share of a market in which the top two producers have 26% and 18% market shares. Id. at 3, 10.[2] Via a tender offer made in December, 1973, BOC acquired for $80 million a 35% interest in Airco, which then took four BOC representatives onto its sixteen-person board of directors. Id. at 5.
 
 
 4
 Two months later, the FTC issued a complaint alleging that the acquisition violated the antitrust laws. Id. at 2. Shortly thereafter the Commission obtained a preliminary injunction, pursuant to 15 U.S.C. § 53(b), requiring BOC, inter alia, to maintain Airco as a separate company during the pendency of expedited administrative proceedings. FTC v. British Oxygen Co., 1974-1 Trade Cas. P 75,004 (D.Del.1974), vacated in part on other grounds, 529 F.2d 196 (3d Cir. 1976) (en banc). Following some six weeks of hearings, an administrative law judge (ALJ) issued an "initial decision" holding, inter alia, that the BOC acquisition of Airco violated Clayton Act § 7. In re British Oxygen Co., No. 8955 (FTC ALJ Oct. 18, 1974). This holding was affirmed by the FTC in December, 1975, at which time divestiture was ordered. Apparently no effort has been made to enforce the FTC's order during the pendency of proceedings in this court.
 
 II.
 
 5
 The theory on which the FTC based its holding in this case, the actual potential entrant theory, must be distinguished at the outset from the closely related theory, not here involved, addressed to the problem of the "perceived" or "recognized" potential entrant. This latter theory is concerned with a present effect that a company not in an oligopolistic market is having on companies which are in that market. Because the insiders view the outsider as a likely entrant (a competitor "waiting in the wings"), they keep prices and profit margins lower than they would if there were no threat of the outsider entering the market either de novo or via a toehold acquisition of a small firm, a threat that might be realized if prices and profits were higher. When the outsider acquires a large firm in the market, it no longer poses a threat, the "in the wings" effect on prices disappears, and competition is thereby lessened. See Falstaff, supra, 410 U.S. at 559-60, 93 S.Ct. 1096 (Marshall, J., concurring); Robinson, Antitrust Developments: 1973, 74 Colum.L.Rev. 163, 186 (1974); Turner, Conglomerate Mergers and Section 7 of the Clayton Act, 78 Harv.L.Rev. 1313, 1362-79 (1965). Reliance on this theory to block acquisitions under Section 7 has been approved by the Supreme Court. Marine Bancorp., supra, 418 U.S. at 625, 94 S.Ct. 2856; Falstaff, supra, 410 U.S. at 532-33, 93 S.Ct. 1096.
 
 
 6
 In the instant case, the FTC specifically found, overruling its ALJ, that there was no proof of any "wings" or "fringe" effect of BOC on the American industrial gases market or on prices therein. FTC Op. at 15 n.8. This finding, not challenged here, makes the instant case different from the typical one, in which there is both a perceived and an actual entrant concern, see FTC v. Atlantic Richfield Co., supra, slip op. at 9 n.6; Turner, supra, 78 Harv.L.Rev. at 1362. Here the FTC has in effect conceded that BOC as a potential entrant was having no present procompetitive effect on the relevant market; the Commission's order is instead grounded entirely on the belief that competition in the American industrial gases market would increase at some time in the future if BOC divests itself of Airco, see Falstaff, supra, 410 U.S. at 560-61, 93 S.Ct. 1096 (Marshall, J., concurring). All parties here are agreed that, had the acquisition not been blocked, competition in the American industrial gases market just after the acquisition would have been "exactly as it was (before the acquisition), neither hurt nor helped," id. at 537 (majority opinion).
 
 
 7
 In determining whether an alleged future effect on competition by itself justifies blocking a present corporate acquisition under the actual potential entrant doctrine, two distinct questions looking to the future must be answered. First, would the firm in question enter de novo or by toehold acquisition[3] if not permitted to enter by acquiring a large company? Second, would the de novo or toehold entry of the firm have procompetitive effects on the market in question?[4] See Marine Bancorp., supra, 418 U.S. at 633, 94 S.Ct. 2856; P. Areeda, Antitrust Analysis 665-66 (2d ed. 1974). There is some question as to the importance of the second of these predictions, since typically in an oligopolistic situation the entry of a large firm as a new competitor necessarily has significant procompetitive effects, see Ford Motor Co. v. United States, 405 U.S. 562, 587, 92 S.Ct. 1142, 31 L.Ed.2d 492 (1972) (Burger, C. J., concurring and dissenting), at least to the extent of "shak(ing) things up," Turner, supra, 78 Harv.L.Rev. at 1383, or engendering "competitive motion," Robinson, supra, 74 Colum.L.Rev. at 183-84.[5] But the importance of the first of the predictions, as to the likelihood of entry, is unquestioned. If there is no showing that the acquiring firm would have entered the market but for the acquisition and if the acquiring firm is exerting no present influence on the market as a perceived potential entrant, as is concededly the case here then it cannot be said that the effect of the acquisition "may be substantially to lessen competition," Clayton Act § 7, 15 U.S.C. § 18. In such situations, to the contrary, "there may even be a competitive gain to the extent that (the acquiring firm) strengthens the market position of the acquired firm." Falstaff, supra, 410 U.S. at 561, 93 S.Ct. at 1115 (Marshall, J., concurring).
 
 III.
 
 8
 In the instant case, with regard to the first of the two predictions, the FTC made a critical, and controverted, finding:
 
 
 9
 (A)s of December 1973, there was a "reasonable probability" that BOC would have eventually entered the U.S. industrial gases market by internal expansion, or its equivalent, but for the acquisition of Airco . . . .
 
 
 10
 FTC Op. at 27. BOC challenges this finding on the factual ground that it is not supported by "substantial evidence," 15 U.S.C. § 21(c), and on the legal ground that the standard used reasonable probability of eventual entry places a lighter burden on the FTC than is justified by the statute and the purposes of the actual potential entrant doctrine. Because we agree with BOC on the legal question and accordingly set aside the FTC's order, we need not reach the question whether, if the legal standard used by the FTC had been appropriate, substantial evidence exists in the record to support the result reached.
 
 
 11
 In Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), the Supreme Court relied on legislative history in reaching the following conclusions about the intent of Congress when it enacted the 1950 amendments to Clayton Act § 7:
 
 
 12
 Congress used the words "may be substantially to lessen competition" (emphasis supplied (by the Supreme Court)), to indicate that its concern was with probabilities, not certainties. Statutes existed for dealing with clear-cut menaces to competition; no statute was sought for dealing with ephemeral possibilities. Mergers with a probable anticompetitive effect were to be proscribed by this Act.
 
 
 13
 370 U.S. at 323, 82 S.Ct. at 1522 (footnote omitted).[6] In short, as the Court wrote in Marine Bancorp., " § 7 deals in 'probabilities,' not 'ephemeral possibilities.' " 418 U.S. at 622-23, 94 S.Ct. at 2870, quoting Brown Shoe Co. v. United States, supra, 370 U.S. at 323, 82 S.Ct. 1502. Thus the FTC was correct in using a "reasonable probability" test here,[7] but its accompanying reference to "eventual entry" makes the overall FTC test, we believe, one based largely on "ephemeral possibilities."
 
 
 14
 There is no indication anywhere in the FTC opinion as to what it meant in using the words "eventual entry," nor does the record indicate how long a period of time might elapse before BOC could be expected to enter the American industrial gases market de novo or by toehold acquisition. The Commission cited evidence indicating a BOC interest in entering the market since early 1970, but conceded that no entry had been attempted prior to the late 1973 acquisition of Airco: "Simply because no entry had been effectuated at the time the Airco opportunity presented itself did not mean that BOC would not have eventually realized its 'long-term objectives' of entering the U.S. market by growth rather than by this major acquisition." FTC Op. at 27 (emphasis added). In its brief to this court, the FTC entirely ignored BOC's argument that "(t)he degree of uncertainty in any economic prediction becomes unacceptably high as it is projected farther and farther into the future." Brief for Petitioners at 82. And at oral argument counsel for the FTC all but conceded that the Commission's "eventually" standard contained no temporal estimate whatsoever, but rather involved "long range" considerations that might take "decades" to come to fruition. Transcript of Oral Argument at 38, 42, 43.
 
 
 15
 These FTC statements, combined with what the Commission omitted to state, together establish the wholly speculative nature of the "eventual entry" test. We hold that such uncabined speculation cannot be the basis of a finding that Section 7 has been violated. As the Supreme Court noted in Marine Bancorp. "the loss of competition 'which is sufficiently probable and imminent ' is the concern of § 7." 418 U.S. at 623 n.22, 94 S.Ct. at 2870 (emphasis added), quoting United States v. Continental Can Co., 378 U.S. 441, 458, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964).[8] While it is not clear and we need not decide whether the probable entry of the acquiring firm must be " imminent" in an actual potential entrant situation, it seems necessary under Section 7 that the finding of probable entry at least contain some reasonable temporal estimate related to the near future, with "near" defined in terms of the entry barriers and lead time necessary for entry in the particular industry, and that the finding be supported by substantial evidence in the record.
 
 
 16
 We emphasize that we are not requiring any exact, precisely calibrated assessment of time of entry. See United States v. Penn-Olin Chemical Co., 378 U.S. 158, 171, 84 S.Ct. 1710, 12 L.Ed.2d 775 (1964). Such a requirement would be as inconsistent with Section 7's focus on "probabilities" as is the FTC's "eventual entry" standard. But here there was no finding regarding a reasonable probability of entry in the near future, nor is there any evidence in the record on which such a finding might be based. Since " 'remote possibilities are not sufficient to satisfy the test set forth in § 7,' " Marine Bancorp., supra, 418 U.S. at 623 n.22, 94 S.Ct. at 2870, quoting Falstaff, supra, 410 U.S. at 555, 93 S.Ct. 1096 (Marshall, J., concurring), a conclusion that Section 7 has been violated cannot be sustained under circumstances such as those here. The order of the FTC must accordingly be set aside.
 
 IV.
 
 17
 In an entirely separate aspect of this case, the FTC held that BOC's acquisition of Airco would tend to lessen competition in three product lines of medical inhalation anesthetic equipment. BOC's subsidiaries and Airco sell such equipment in the United States, so that they are at present actual competitors. This aspect of the case thus has nothing to do with the potential competition doctrine, but instead involves the more widely used Section 7 proscription on "horizontal" mergers, see Brown Shoe Co. v. United States, supra, 370 U.S. at 334, 82 S.Ct. 1502.
 
 
 18
 This aspect of the case is also of much less overall significance than the industrial gases aspect. Whereas industrial gases account for substantial proportions of both BOC's and Airco's total sales, their sales of the three medical product lines at issue amount to less than one per cent of each of their total sales. Compare FTC Op. at 3 with id. at 42. However, their presence in each of these product lines is significant. According to the FTC's market share data (which are vigorously challenged by BOC), Airco and BOC are the two largest American manufacturers of anesthesia machines and vaporizers, and Airco has an 88% share of the anesthesia face mask market. Id. at 42-43.
 
 
 19
 In addition to challenging the FTC's market share data, its use of this data, and its definition of relevant product markets, BOC raises two other points that have significance apart from the intrinsic validity or non-validity of the medical equipment holding. First, it alleges that the FTC's analysis in terms of three equipment submarkets violated an express understanding, agreed to by FTC complaint counsel, to the effect that inhalation anesthetic equipment would be treated as one large market, and that BOC shaped its defense strategy with this understanding in mind. Second, BOC argues that the Commission did not intend for its finding of a Section 7 violation in the medical equipment lines by itself to justify its order to BOC to divest itself of Airco and that accordingly, if we overturn the industrial gases holding, as we have, a modified order requiring BOC to divest itself of its subsidiaries involved in the relevant product lines would meet all of the FTC's remaining concerns, assuming relief were warranted.
 
 
 20
 We believe that both of these points deserve careful attention; the FTC has apparently not yet had an opportunity to address either one. We have previously held that the FTC lacks authority to consider an issue not litigated before its ALJ. Stanley Works v. FTC, 469 F.2d 498, 508-09 n.24 (2d Cir. 1972), cert. denied, 412 U.S. 928, 93 S.Ct. 2750, 37 L.Ed.2d 155 (1973); see id. at 520-21 (dissenting opinion agreeing with majority on this question). See also Administrative Procedure Act § 5, 5 U.S.C. § 554(b), (c). With regard to the second point, BOC's statements about the FTC's intentions and the workability of a modified order seem reasonable, but we have neither findings nor evidence on these questions, since of course the Commission did not anticipate that we would overturn its holding on the industrial gases aspect of the case. Hence a remand to the FTC is necessary to allow the Commission to reconsider its medical equipment decision in light of BOC's allegations and our industrial gases holding.
 
 V.
 
 21
 In a third and final aspect of this case, the FTC ruled that Airco had "technically" violated the Federal Trade Commission Act, 15 U.S.C. § 45, by "facilitat(ing) an acquisition of stock (by BOC) that violated Section 7 of the Clayton Act." FTC Op. at 45. It accordingly ordered Airco to take certain actions "to restore (its) independence from BOC control." Id. This directive is entirely dependent upon the validity of the requirement that BOC divest itself of Airco, as the FTC's opinion implicitly concedes, see id. & n.36. Since we are here setting aside this latter aspect of the FTC's order we must also set aside its directive to Airco.
 
 
 22
 Order set aside and cause remanded to the Federal Trade Commission for reconsideration of its medical inhalation anesthetic equipment holding in light of BOC's allegations and the setting aside of the Commission's industrial gases holding.
 
 
 
 *
 Hon. Frederick vanPelt Bryan of the Southern District of New York, sitting by designation
 
 
 [1]
 The petition was actually filed jointly by BOC and several of its subsidiaries, all of which are affected by the FTC order. Because the separate identity of these subsidiaries has no bearing on the principal issues in this case, we adopt the convention of the FTC below of referring to all BOC-related companies under the singular noun "BOC." See In re British Oxygen Co. ("Findings as to the Facts, Conclusions and Order"), No. 8955, slip op. at 9 (FTC Dec. 8, 1975)
 
 
 [2]
 The FTC's definition of the relevant domestic industrial gases market is challenged by BOC, but this dispute does not affect our disposition of the instant appeal. The question of market definition is relevant to the issue of how important potential competition from BOC would be to the industrial gases industry, an issue we need not reach here
 
 
 [3]
 The amicus brief argues that BOC's acquisition of Airco should be viewed as a toehold acquisition. Under the generally accepted definitions of such an acquisition, however, see, e. g., Kennecott Copper Corp. v. FTC, 467 F.2d 67, 77-78 n.8 (10th Cir. 1972) ("acquisition of a firm too small to compete by itself against the largest firms"), cert. denied, 416 U.S. 909, 94 S.Ct. 1617, 40 L.Ed.2d 114 (1974); United States v. Phillips Petroleum Co., 367 F.Supp. 1226, 1258 (C.D.Cal.1973) (acquisition "sufficient to assist the potential entrant over the entry barriers . . . but not so large that the entrant merely replaces the acquired company"), aff'd mem., 418 U.S. 906, 94 S.Ct. 3199, 41 L.Ed.2d 1154 (1974); Robinson, Antitrust Developments: 1973, 74 Colum.L.Rev. 163, 182 n.137 (1974) (acquisition "of a small market factor that presumably would increase the vigor of competition by strengthening the acquired firm"); Turner, Conglomerate Mergers and Section 7 of the Clayton Act, 78 Harv.L.Rev. 1313, 1368 (1965) ("acquisition of a small firm whose market share has remained the same . . . and that is demonstrably less efficient than its large competitors"), it is most unlikely that Airco, the third largest company in the American industrial gases market, holding a 16% share while the top two firms have 26% and 18% shares, could be considered a toehold firm. See generally Comment, Toehold Acquisitions and the Potential Competition Doctrine, 40 U.Chi.L.Rev. 156 (1972); Case Note, 89 Harv.L.Rev. 800 (1976). We shall assume for the balance of this discussion that BOC's acquisition did not amount to a toehold
 
 
 [4]
 The FTC's opinion mentions an additional source of possible procompetitive BOC influence, derived not from BOC's future entry into the market but from BOC's future presence on the fringe of the market. FTC Op. at 16. It is theoretically possible that a firm not currently exerting a fringe effect, as is concededly the case here, id. at 15 n.8, 16, could exert such an effect in the future, regardless of whether it actually entered the market. Mr. Justice Marshall has termed such a firm "a potential perceived potential entrant," Falstaff, supra, 410 U.S. at 560 n.15, 93 S.Ct. at 1115 (concurring opinion) (emphasis in original), and noted the difficulties involved in moving from theory to reality:
 As its very name suggests, . . . such a firm would be still a further step removed from the exertion of actual, present competitive influence, and the problems of proof are compounded accordingly particularly in light of the showing of reasonable probability required under § 7.
 Id.
 When there is no evidence of a past or present fringe effect, it would seem the height of speculation to consider a future fringe effect as a factor independent of the likelihood that the firm in question would actually enter the market. The entirely speculative nature of such a factor is apparent on the face of the Commission's opinion here:
 Although there is no evidence of such disciplining effect in the past, if presents trends continue and supply becomes tight, leading firms may coordinate pricing decisions and areas of specialization . . . . The possibility of entry by BOC may become a factor to be reckoned with.
 FTC Op. at 16 (emphasis added). No evidence was cited by the Commission as to the likelihood of any of the key variables becoming reality in the future. Accordingly, we will not consider the possibility of a future fringe effect as an independent reason for blocking this acquisition.
 
 
 [5]
 According to Professor Turner:
 (T)he problem of proving that the new entrant would have been a substantial competitive factor can be overstated. It is highly likely that a new entrant in . . . a tight oligopoly industry . . . will shake things up a great deal in the process of trying to acquire a substantial market share, even if in the end its inroads are rather modest.
 
 
 [78]
 Harv.L.Rev. at 1383. The Supreme Court's apparent emphasis on the procompetitive effects factor in Marine Bancorp., 418 U.S. at 633, 94 S.Ct. 2856, must be read in the context of the unique facts of that case, in which banking industry regulation of branch banks hindered the acquiring firm's ability to enter or expand, id. at 638, 94 S.Ct. 2856. See L. Sullivan Handbook of the Law of Antitrust 640 (1977); The Supreme Court, 1973 Term, 88 Harv.L.Rev. 41, 256-58 (1974)
 
 
 [6]
 The Court in Brown Shoe Co. v. United States set forth the 1950 amendments to Section 7 of the Clayton Act in footnote 18, 370 U.S. at 311, 82 S.Ct. 1502. In another footnote the Court discussed the legislative history at some length, stating in part:
 In the course of both the Committee hearings and floor debate, attention was occasionally focused on the issue of whether "possible," "probable" or "certain" anticompetitive effects of a proposed merger would have to be proven to establish a violation of the Act. . . . The final Senate Report on the question was explicit on the point:
 "The use of these words ("may be") means that the bill, if enacted, would not apply to the mere possibility but only to the reasonable probability of the prescribed (sic ) effect. . . . A requirement of certainty and actuality of injury to competition is incompatible with any effort to supplement the Sherman Act by reaching incipient restraints." S.Rep. No. 1775, 81st Cong., 2d Sess. 6. See also 51 Cong.Rec. 14464 (remarks of Senator Reed).
 370 U.S. at 323 n.39, 82 S.Ct. at 1522.
 
 
 [7]
 Because of the predictive or probabilistic nature of the entire actual potential entrant doctrine, Professor Turner has argued that a higher standard of proof regarding entry of the firm is appropriate when, as is the case here, "the sole alleged anticompetitive consequence of a merger is the loss of what would have been a new entrant." 78 Harv.L.Rev. at 1386 (emphasis in original). The standard suggested is one of certainty, id., or at least of "clear proof that the firm would in fact have entered an admittedly rare case, and one bound to become even less frequent if this rule were adopted," id. at 1384. Turner's test has apparently been adopted by the Fourth Circuit, FTC v. Atlantic Richfield Co., No. 76-2250, 549 F.2d 289 at 294-295 (4th Cir. 1977), which found "peripheral support" for Turner's view in Falstaff and Marine Bancorp., id. at 13. The Fourth Circuit was, however, concededly drawing implications from ambiguous Supreme Court statements or actions in the latter two cases. See id. at 14. In view of the ample express authority, including congressional authority, in favor of a reasonable probability standard, as discussed in the text and note 6 supra, we decline to adopt any more stringent standard here
 
 
 [8]
 The Court in United States v. Continental Can Co., 378 U.S. 441, 458, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964), in turn cited United States v. El Paso Natural Gas Co., 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964), for this proposition. We assume this reference was to Mr. Justice Douglas's language for the El Paso Court:
 The effect on competition in a particular market through acquisition of another company is determined by the nature or extent of that market and by the nearness of the absorbed company to it, that company's eagerness to enter that market, its resourcefulness, and so on.
 Id. at 660, 84 S.Ct. at 1049. The context makes clear that in El Paso the Court was referring to proximity both in time and place. Id. at 660-61, 84 S.Ct. 1044. Since there a geographic market, and a regulated one at that, was involved, considerations of proximity in place were relevant; here that is not the case.